# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **GARY ADAMS,** | )<br>)<br>) |
| Plaintiff, | ) Case No. 2:16CV00027<br>) |
| v. | ) **OPINION AND ORDER**<br>) |
| **AMERICAN OPTICAL CORPORATION, ET AL.,** | ) By: James P. Jones<br>) United States District Judge<br>) |
| Defendants. | ) |

*Michael B. Martin, Martin Walton Law Firm, Houston, Texas, for Plaintiff; Carol Dan Browning, Stites & Harbison PLLC, Louisville, Kentucky, for Defendant American Optical Corporation; M. Trent Spurlock, Dinsmore & Shohl LLP, Louisville, Kentucky, for Defendant Mine Safety Appliances Company, LLC.*

In this diversity action, plaintiff Gary Adams, a former coal miner, alleges that he developed pneumoconiosis and silica-induced airway obstruction after wearing faulty respirators manufactured, designed, and sold by defendants American Optical Corporation and Mine Safety Appliances Company. The defendants have moved for summary judgment, arguing that the plaintiff's claims are barred by Virginia's two-year statute of limitations for personal injury actions. For the reasons that follow, I will grant the defendants' Motions for Summary Judgment.

I.

The following facts taken from the summary judgment record are either undisputed or, where disputed, are presented in the light most favorable to the plaintiff as the nonmoving party.

From 1981 to 2014, plaintiff Gary Adams worked as a coal miner. During this time, he worked for various coal mining companies as a roof drill helper, mine helper and operator, electrician helper, roof bolter operator, section foreman, and mine foreman. He worked underground and was exposed to silica, coal dust, and other dust during the course of his employment. To protect his lungs, he wore respirators manufactured, designed, marketed, and sold by defendants American Optical Corporation ("American Optical") and Mine Safety Appliances Company ("MSA").

Beginning in 1991, Adams regularly participated in a National Institute of Occupational Safety and Health ("NIOSH") program that offered free X rays to miners at mining sites. After an X ray in April 2000, Adams received three letters dated June 2000. One of the letters, from NIOSH, informed him that NIOSH would report to him "any significant findings other than pneumoconiosis" and that a physician who reviewed his X ray found possible evidence of granulomas. Def. MSA's Mot. Summ. J. Ex. B, Adams Dep. Ex. 6, ECF No. 76-2. The second letter, also from NIOSH, informed him that physicians found "Category 1, simple

coal workers' pneumoconiosis." *Id.* at Adams Dep. Ex. 8, ECF No. 76-2. The third letter was from the Mine Safety and Health Administration ("MSHA"), and stated that Adams' X ray showed that he "HA[D] ENOUGH COAL WORKERS' PNEUMOCONIOSIS ("BLACK LUNG") TO BE ELIGIBLE FOR THE 'OPTION TO WORK IN A LOW DUST AREA' OF A MINE." *Id.* at Adams Dep. Ex. 4, ECF No. 76-2.[1]

In September 2006, Adams received another letter from MSHA informing him that a NIOSH X ray taken in June 2006 showed that he "HA[D] ENOUGH COAL WORKERS' PNEUMOCONIOSIS" to be eligible to work in a low-dust area. *Id.* at Adams Dep. Ex. 7, ECF No. 76-2. Adams also received a letter from NIOSH in September 2006 regarding this X ray, which stated that it "shows DEFINITE EVIDENCE of CATEGORY 1 PNEUMOCONIOSIS." American Optical's Mot. Summ. J. Ex. 6, Sept. 14, 2006, NIOSH Letter 2, ECF No. 75-6.

In August 2007, due to this letter or a similar one from NIOSH, Adams began seeing pulmonologist Dr. Mahmood Alam to have his lung condition evaluated. Dr. Alam's notes from this visit state that Adams had underlying coal workers' pneumoconiosis ("CWP"), cough, and shortness of breath. During the

---

[1] Pursuant to 30 C.F.R. § 90.3, any coal miner whose X rays show evidence of pneumoconiosis must be given the option to work in an area of the mine where dust is maintained below an applicable standard. 30 C.F.R. § 90.3(a). This is referred to as the "Part 90" option.

visit, Dr. Alam performed a pulmonary workup on Adams, which included lung capacity testing, called spirometry, and a computerized tomography ("CT") scan of his chest. Dr. Alam's interpretation of the spirometry was mild breathing restriction, and he recommended that Adams stop working in the mines or work in a less dusty environment. In his deposition in this case, Dr. Alam testified that he believes the breathing restriction was related to occupational lung disease. However, he also testified that spirometry alone cannot provide a diagnosis, and its results must be correlated with X rays and CT scans to determine how they relate to changes in the lungs.

At a follow-up visit in September 2007, Dr. Alam told Adams that his CT scan was negative for CWP but there were calcified granulomas in his lungs. Dr. Alam's notes from this follow-up visit state that Adams has a history of CWP and chronic bronchitis. At his deposition, Dr. Alam testified that it was reasonably probable that the chronic bronchitis was caused by exposure to coal dust.[2]

In June 2009, Adams again received a letter from MSHA notifying him that an X ray taken in April 2009 showed enough CWP to make him eligible to work in a low-dust area. After receiving this letter, Adams opted to exercise his Part 90 option because he was getting more winded than he had been in the past. He also

---

[2] Dr. Alam testified that his opinions were based on a reasonable medical probability and that when he stated that something is probable, he is referring to a reasonable medical probability.

made another appointment with Dr. Alam. Dr. Alam performed another CT scan, which showed that Adams still had calcified granulomas but was negative for CWP. Dr. Alam's notes from this visit list chronic obstructive pulmonary disease ("COPD"), emphysema, and CWP as his assessment, or differential diagnosis, of the potential causes of Adams' abnormal X rays. In his deposition, Dr. Alam testified that all of these diseases are caused by occupational exposure to dust. Dr. Alam also testified that CT scans are more sensitive and accurate than X rays, and X rays cannot be used to make diagnoses without being clinically correlated by looking to the patient's history, a CT scan, or tissue diagnosis, among other things.[3] Thus, he stated that Adams' NIOSH X rays suggested abnormalities in his lungs but could not be used to diagnose CWP by themselves. However, Dr. Alam also testified that X rays may be used to make a differential diagnosis, that is, a list of possible diagnoses. He also explained that his notes from Adams' 2007 and 2009 visits meant that since Adams had been a coal miner for over 20 years, was a nonsmoker, and had shortness of breath, CWP was part of his differential diagnosis.

---

[3] Defense expert Dr. James Lockey also testified in his deposition that chest X rays alone are not diagnostic and must be clinically correlated with the patient. In addition, he testified that non-occupational diseases not caused by dust may mimic pneumoconiosis on an X ray.

When asked about the letters that Adams received from NIOSH and MSHA, Dr. Alam testified that they represented a finding by NIOSH's X ray readers of simple clinical pneumoconiosis, or stage one pneumoconiosis, which manifests as scarring on the lungs, and he had no reason to doubt the accuracy of that finding. He also characterized the letters as finding entry-level pneumoconiosis. Dr. Alam explained that the NIOSH X ray readings on which these letters were based assigned Adams a perfusion rating of 1/0, which indicates minimal perfusion, or nodules on the lungs.[4] He also expressed that a 1/0 rating was very common for coal miners, and miners almost always had some coal dust on their lungs. He explained that although the X rays upon which the letters were based suggested stage one pneumoconiosis, the more accurate CT scans that he performed were negative for CWP, and thus there was no clinical correlation to support the suggestion from the X rays.

Dr. Alam also testified that calcified granulomas, which appeared on Adams' 2007 and 2009 CT scans, are small scars on the lungs that could represent any number of health problems, including fungal infections in the lungs, a history of smoking, or pneumonia. He testified that CWP does not cause calcified granulomas. However, Dr. Alam also agreed that there was a reasonable medical

---

[4] Dr. Lockey, the defendants' expert, similarly testified that an assessment of 1/0 would not represent a diagnosis of CWP and reflects an "iffy call" as to whether anything was wrong in the lungs. Pl.'s Resp. to MSA's Mot. Summ. J. Ex. 1, Lockey Dep. 88:14-25, ECF No. 94-1.

probability "as of 2007 or 2009 that Mr. Adams had some degree of CWP scarring in his lungs." Def. MSA's Mot. Summ. J. Ex. C, Alam Dep. 208:4-13, ECF No. 76-3.

In 2009 and 2010, Adams had office visits with Dr. April Hall, his primary care physician and a colleague of Dr. Alam. In her records, Dr. Hall noted that Adams had a history of CWP. In Dr. Alam's deposition, he testified that this mention of CWP was in Adams' records from day one, likely because it had always been part of his differential diagnosis. Adams confirmed this interpretation in his deposition, stating that after the NIOSH letters, all of his medical records mention CWP.

In a 2010 visit, Dr. Hall began prescribing Adams an albuterol inhaler. Dr. Alam testified that the inhaler would be for relief from Adams' obstructive lung function, which he believed was probably related to his exposure to coal dust and occupational lung disease. However, Dr. Lockey testified that the inhaler was likely for Adams' asthma.

In a 2011 visit, Dr. Hall's notes state that Adams complained of shortness of breath when climbing inclines. Dr. Hall referred Adams to Dr. Jose Velazquez, a cardiologist, to determine if a cardiac problem was causing his shortness of breath. Adams first saw Dr. Velazquez on March 2, 2011, and Dr. Velazquez did not find any cardiac causes for his shortness of breath. Adams had a follow-up visit with

Dr. Velazquez on March 16, 2011. During this visit, Dr. Velazquez performed a lung exam and found decreased bilateral air entry with diffuse rhonchi and dry crackles. Dr. Velazquez's notes state that Adams has poor exercise tolerance "possibly secondary to a significant component of lung disease." *Id*. at Ex. 30, ECF No. 76-3. Dr. Alam testified that these are symptoms associated with occupational lung disease and CWP.

In 2011, Adams had two evaluations at the University of Kentucky for sleep apnea. Records from both of these visits reflect that Adams told the doctors that he had black lung. Both Adams and Dr. Alam testified that this was because of the NIOSH X rays and letters rather than a specific diagnosis of black lung. Records from these visits also note a history of CWP and chronic shortness of breath. Dr. Alam testified that this was correct given that CWP was always part of Adams' differential diagnosis.

In October 2012, Adams had another chest X ray, which Dr. Alam testified was likely done prior to a surgical procedure. Radiologist Dr. Robert Buck read the X ray and found micronodular interstitial process that was worse than in 2007, which Dr. Alam testified was probably related to CWP. However, Dr. Alam also testified that X rays alone are not diagnostic and must be clinically correlated. In August 2013, Dr. Buck read another of Adams' chest X rays and found that the micronodular interstitial process was worse than in the October X ray.

Also in August 2013, Adams underwent pulmonary function testing, which revealed a moderate restrictive deficit in his lung function.

In August 2014, Adams filed an application for benefits under the Black Lung Benefits Act, in which he stated that he had shortness of breath, especially upon exertion.

On October 2, 2014, Dr. D.L. Rasmussen diagnosed Adams with complicated pneumoconiosis. At that visit, an exercise study that indicated marked loss of lung function clinically correlated a chest X ray that showed distortions in Adams' lung structures, a coalescence of opacities, and large masses in both lobes.

On November 2, 2016, Dr. Alam, who had not seen Adams since 2009, determined that CWP was no longer a differential diagnosis but rather was Adams' primary diagnosis. He testified that on that day, he observed drastic changes in Adams' lungs, including distortion and masses. He also testified that CWP is a latent occupational disease, meaning that it can manifest 15 years or more after an individual's exposure to coal dust. In addition, he explained that CWP is a "slow, progressive disease" that may develop over a 10-to-15-year period, but accelerated cases of CWP usually develop over five years. Alam Dep. 56:14, ECF No. 76-3.

Dr. Lockey, who had not treated Adams but had reviewed his medical records, testified that it was his opinion that Adams first developed signs and symptoms of CWP around 2010 to 2011. In support of this statement, Dr. Lockey

pointed to the micronodular interstitial changes noted in Dr. Buck's X ray readings in 2012.

On September 29, 2016, Adams filed the present Complaint in state court against American Optical and MSA, alleging that their respirators were in a defective condition and unreasonably dangerous for use, that they breached the implied warranty of fitness for a particular purpose in light of the condition of their respirators, and that they negligently failed to properly design and test their respirators or provide adequate warnings and instructions regarding their use. Adams alleges that as a result, he developed pneumoconiosis and silica-induced airway obstruction. The defendants timely removed the case to this court, and following discovery, they now move for summary judgment.[5] The summary judgment motion has been fully briefed and orally argued and is ripe for decision.

## II.

The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence could result in a different jury verdict. *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Only disputes over material facts will preclude the entry of summary

---

[5] This court has subject-matter jurisdiction based on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332(a)(1), (c)(1).

judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a summary judgment motion, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the court may not itself weigh the evidence or determine the truth of the matter. *Anderson*, 477 U.S. at 249.

Defendants American Optical and MSA have moved for summary judgment on the ground that Adams' claims are barred by the applicable statute of limitations.

"Because jurisdiction in this case is based upon diversity, we must look to Virginia law to determine both the applicable statute of limitations and the time at which these claims accrued thereunder." *Joyce v. A.C. & S., Inc.*, 785 F.2d 1200, 1203 (4th Cir. 1986). In Virginia, "every action for personal injuries, whatever the theory of recovery, . . . shall be brought within two years after the cause of action accrues." Va. Code Ann. § 8.01-243(A).[6] In cases of personal injury, the cause of action accrues and the two-year statute of limitations begins to run from the date the injury was sustained. Va. Code Ann. § 8.01-230. The date when the injury was sustained "must be established by competent evidence 'that pinpoints the

---

[6] This rule includes causes of action for personal injuries arising from an alleged breach of warranty. *Caudill v. Wise Rambler, Inc.*, 168 S.E.2d 257, 259 (Va. 1969).

precise date of injury with a reasonable degree of medical certainty.'" *Lo v. Burke*, 455 S.E.2d 9, 12 (Va. 1995) (quoting *Locke v. Johns-Manville Corp.*, 275 S.E.2d 900, 905 (Va. 1981)). The defendant bears the burden of proof to establish facts necessary to show that the plaintiff's claim is barred by the statute of limitations. *Id.*

"In Virginia, only the slightest injury is required to start the running of the limitations period." *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir. 1988). Virginia courts define an injury as a "positive, physical or mental hurt to the claimant, not legal wrong to him in the broad sense that his legally protected interests have been invaded." *Joyce*, 785 F.2d at 1204 (quoting *Locke*, 275 S.E.2d at 904). In "'creeping disease' cases where, by definition, there may be gaps between the onset of various distinct injuries," the statute of limitations begins running when the plaintiff sustains the first injury related to the disease at issue. *Id.* at 1203, 1205 (holding that the plaintiff's cause of action accrued when he sustained his first asbestos-related disease, pleural thickening, rather than when he later developed pleural effusions and parenchymal asbestosis disease).

"The date that plaintiff discovers the injury is immaterial to the running of the statute." *Smith v. Danek Med., Inc.*, 47 F. Supp. 2d 698, 701 (W.D. Va. 1998) (applying Virginia law). Moreover, the date the injury is diagnosed or the

diagnosis is communicated to the plaintiff is immaterial to the running of the statute. *Id.* In fact, "it is conceivable that in a given case the evidence will demonstrate that an injury occurred months or even years before the onset of symptoms." *Joyce*, 785 F.2d at 1204.

The parties agree that Virginia's two-year statute of limitations for personal injury actions applies in this case, and they agree that Adams filed the present lawsuit in state court on September 29, 2016. Thus, for the action to be timely, Adams' cause of action must have accrued no earlier than September 29, 2014. Adams contends that "no specific injury occurred until [pneumoconiosis] was first observed by Dr. Rasmussen on October 2, 2014," and thus his cause of action accrued on that date, three days within the statute of limitations. Pl.'s Resp. to MSA's Mot. Summ. J. 23, ECF No. 94.

American Optical and MSA contend that Adams' medical records document the progression of his coal dust-related lung disease over a 14-year period beginning in 2000, and thus his cause of action accrued well outside the statute of limitations. As evidence that Adams' injury was sustained as early as 2000, they point to the 2000, 2007, and 2009, X rays that NIOSH and MSHA found indicated black lung, as well as Dr. Alam's testimony that these findings were of stage one, simple CWP. They also point to Dr. Alam's findings in 2007 and 2009 that Adams had impaired lung function, along with his deposition testimony that it was

probable that this was due to occupational lung disease. In addition, they cite Adams' use of an albuterol inhaler to aid his breathing, which began in 2010 and which Dr. Alam stated was probably due to occupational lung disease. Moreover, they point to Dr. Velazquez's 2011 lung exam, in which he found diffuse rhonchi and dry crackles; Dr. Buck's 2012 and 2013 X ray readings, which found micronodular interstitial process; and Dr. Alam's pulmonary function testing, which revealed a moderate restrictive deficit in Adams' lung function. The defendants also note Adams' own statements to doctors that he had black lung and his application for black lung benefits. Lastly, they argue that it is medically and scientifically impossible for Adams to have developed an advanced, progressive lung disease during the three days between September 29, 2014, the outer limit of the two-year statute of limitations, and October 2, 2014, when Dr. Rasmussen diagnosed Adams with CWP.

In response, Adams contends that each of these pieces of evidence fails to pinpoint the precise date of his injury with a reasonable degree of medical certainty. With respect to the defendants' reliance on the NIOSH X rays and its analysis of them, Adams points to Dr. Alam and Dr. Lockey's testimony that without clinical correlation, X rays alone do not provide a reasonable degree of medical certainty regarding the onset of his injury. He also points to Dr. Alam's testimony that the same is true for spirometry results showing impaired lung

function. In addition, Adams notes that his 2007 and 2009 CT scans, which are more accurate than X rays, were negative for CWP and instead showed calicified granulomas, which do not indicate the presence of CWP. With respect to the defendants' reliance on his inhaler use, Adams argues that in light of Dr. Lockey's testimony that the inhaler was likely for asthma, it also fails to show the onset of his injury to a reasonable degree of medical certainty. Regarding Dr. Velazquez's 2011 lung exam, Adams notes that although Dr. Velazquez opined that lung disease could be causing his shortness of breath, the doctor also stated that it could be due to coronary spasms or esophageal spasms. As to Dr. Buck's 2012 and 2013 X rays and Dr. Alam's 2013 pulmonary testing, Adams again argues that without clinical correlation, the results are insufficient to show the onset of his injury. Moreover, Adams contends that the references to black lung and CWP throughout his medical files, along with his own statements that he had black lung, are because it was consistently part of his differential diagnosis, but not an actual diagnosis or reasonably certain indication of the onset of his injury. He also states that he filed for black lung benefits in 2014 to get a free examination from the Department of Labor to determine if he had CWP, not because he in fact had it.

At oral argument, Adams' counsel conceded that common sense indicates that Adams did not develop complicated CWP in the three days between September 29, 2014, and October 2, 2014, and he agreed that Adams had the

disease more than two years before suit was filed. However, he contends that because the defendants have failed to pinpoint the precise date of Adams' initial injury with a reasonable degree of medical certainty, they have failed to satisfy the burden of proof for their statute of limitations defense. Moreover, counsel argues that prior to October 2, 2014, Adams had no right of action because his doctors had concluded that he was negative for CWP. Counsel states that "[t]he defendant's argument creates the profound contradiction that Mr. Adams should have filed a lawsuit for pneumoconiosis at a time when his doctors had told him he did not have the disease." Pl's Mot. for Leave to file Sur-reply 3, ECF No. 103.

    I find that Adams' claims are barred by Virginia's two-year statute of limitations for personal injury actions. It is conceded that he had CWP prior to September 29, 2014, the outer bound of the statute of limitations given the date he filed his Complaint. Moreover, the record supports this concession. On October 2, 2014, Dr. Rasmussen diagnosed Adams with complicated pneumoconiosis, based in part on an X ray that showed large opacities and masses in Adams' lungs. Dr. Alam, Adams' own doctor, testified that pneumoconiosis is a slow, progressive disease that, even in an accelerated case, takes five years or more to develop. Together, these facts show with a reasonable degree of medical certainty that Adams developed CWP prior to September 29, 2014.

In addition, the record shows with a reasonable degree of medical certainty that Adams developed injuries related to CWP prior to September 29, 2014. Dr. Alam testified that there was a reasonable medical probability "as of 2007 or 2009 that Mr. Adams had some degree of CWP scarring in his lungs." Alam Dep. 208:4-13, ECF No. 76-3. He also testified that it was probable that the moderate restrictive deficit in Adams' lung function, revealed in August 2013, was caused by exposure to coal dust. Under *Joyce*, these injuries were sufficient to trigger the running of the statute of limitations.

The parties' dispute as to when Adams first sustained a coal-dust related injury is not material in light of the undisputed evidence showing that his CWP and CWP-related injuries developed prior to September 29, 2014, outside the statute of limitations. *See Joyce*, 785 F. 2d at 1203, 1205 (finding that the claim was barred by the statute of limitations and noting that "although the date of Joyce's first injury—pleural thickening—is unclear, he does not dispute that it developed more than two years before [his] action was filed"). Moreover, Adams' contention that no injury occurred until Dr. Rasmussen found that he had CWP on October 2, 2014, is contrary to Virginia law. Virginia expressly rejects such a discovery rule, whether the discovery is by the plaintiff or his or her treating physician. Although sadly this may present an insurmountable challenge for plaintiffs suffering from latent diseases, I join in the Fourth Circuit's response:

> We recognize that this rule may effectively preclude recovery for serious injuries that develop more than two years after an initial hurt, however slight, given the difficulty of proving future damages when the fact and extent of future injury is unknown. Although the indivisible cause of action theory is readily justified in cases of traumatic injury, where all damages are generally immediately apparent, its result may be harsh when applied to asbestos-related or other "creeping disease" cases where, by definition, there may be gaps between the onset of various distinct injuries caused by exposure to asbestos. We are not, of course, at liberty to modify the rule. Any change in favor of . . . latent disease plaintiffs must come from the Supreme Court of Virginia or the General Assembly of that state.

*Id.* at 1205.

### III.

For the foregoing reasons, it is **ORDERED** as follows:

1. Defendant American Optical Corporation's Motion for Summary Judgment, ECF No. 75, is GRANTED; and

2. Defendant Mine Safety Appliances Company's Motion for Summary Judgment, ECF No. 76, is GRANTED.

A separate Judgment will be entered forthwith.

ENTER: May 28, 2019

/s/ *James P. Jones*
United States District Judge